**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CR-43 TS |
| | ) | |
| JOSEPH JERMAINE WOODS | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendant Joseph Jermaine Woods's Motion to Suppress [DE 39], filed on July 9, 2009. The Defendant contends that the police conducted an investigatory stop without specific and articulable facts sufficient to give rise to reasonable suspicion that the Defendant had committed a crime, and that the evidence recovered during the stop should therefore be suppressed.

**BACKGROUND**

By way of an Indictment filed on April 22, 2009, the Government charges that on March 31, 2009, the Defendant knowingly and intentionally possessed with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), and knowingly carried a firearm during and in relation to that drug trafficking crime in violation of 18 U.S.C. § 924(c). On July 9, 2009, the Defendant moved "to suppress incriminating evidence obtained by the Government following the unreasonable and unlawful seizure of the Defendant on March 31, 2009." (Mot. to Suppress 1, DE 39). In his Motion, the Defendant argued that the officer who ordered the stop of his vehicle "relied upon third hand, mostly uncorroborated information to develop a hunch that the individual driving the truck was involved in illegal drug activity," and requested that any evidence acquired following the stop and seizure be suppressed. (Motion to Suppress 3.) On July

23, the Government responded, submitting that the officer had ample reasonable suspicion and indicating that an evidentiary hearing was necessary to establish the facts pertinent to the Motion to Suppress.

On September 10, the Court conducted an evidentiary hearing on the Motion to Suppress. The Defendant was present and represented by attorney Albert Anzini III. The Government was represented by Assistant United States Attorney Anthony Gellar. The Court heard testimony from Fort Wayne Police Department Officers Angela Reed and Mark Walters, and Fort Wayne Police Detectives Kurt Franceus and Darrick Englemann. The Court also admitted into evidence various maps, photographs, and recordings. At the conclusion of the hearing, the Court took the Motion under advisement and gave the parties additional time to file briefs.

On November 2, the Defendant filed his post-hearing Brief in Support of Motion to Suppress [DE 57]. The Government filed its Response Brief Regarding Motion to Suppress on November 23 [DE 60], and on December 8 the Defendant filed his Notice of Intent [DE 61], advising the Court that he did not intend to file a reply brief.

## FINDINGS OF FACT

Upon consideration of the credibility of the witnesses and the examination of the evidence, the Court makes the following findings of fact.

On March 19, 2009, the apartment manager at Plumwood Apartments in Fort Wayne, Indiana, called the Fort Wayne Police Department to report suspicious activity at the apartment complex. An administrative assistant recorded the caller's information and forwarded it to Fort Wayne Police Department Vice and Narcotics Division Sergeant Mark Walters. The caller

reported that about twice a month, two vehicles would pull into the Plumwood Apartment complex, generally between 2:00 PM and 6:00 PM. One car was a black Taurus with Ohio license plates, and the other car varied but always had an Indiana handicap plate. The driver of the Taurus was a white male and the driver of the other vehicle was a black male. The two men would back their vehicles into a cul-de-sac at the end of the drive, open their respective trunks, and exchange a garbage bag and black bag. The entire meeting would only last one to two minutes, and then they would drive away.

Later that day, Sergeant Walters went to the Plumwood Apartments to talk to the apartment manager who had called and to conduct surveillance. The manager told Sergeant Walters that she was certain that the occupants of the two vehicles were not tenants of the apartments, and noted that other tenants had noticed the suspicious behavior as well. She described the items they exchanged as a black trash bag and a smaller, duffel-type bag, and stated that the activity had been going on for two to three months. Sergeant Walters was able to inspect the area at the end of the cul-de-sac where the two men conducted their exchange. The Plumwood Apartments are located north of Lake Avenue on Lakehurst Drive, which is the north/south road that connects the apartments to Lake Avenue. The cul-de-sac at the end of Lakehurst Drive backs up to a wood line where there are no other apartments or buildings.

Sergeant Walters believed that the short meetings between the two men from Ohio and Indiana were indicative of drug trafficking, specifically marijuana because a garbage bag of cocaine would weigh too much. He believed that the one-road access to the meeting spot was an ideal place to exchange contraband because traffic in the area would be limited, and the men would have a clear view of anybody driving toward them on Lakehurst Drive. Backing up to the

3

wooded area and opening their trunks would provide some degree of privacy and shield the rear license plate numbers. He also attributed significance to the manager's statement that the two men were not tenants, and thus did not have an obvious legal purpose to be in the area. He suspected, based on the manager's statement that one of the vehicles would arrive shortly before the other vehicle, that the one arriving first would call the other one to say he was at the spot. Sergeant Walters testified that Fort Wayne is a source location for drugs to northwestern Ohio.

Sergeant Walters conducted surveillance from 2:00PM to 4:00 PM that day, but did not see any activity. He told the manager to call the police if she saw the vehicles arrive, and that the police would try to respond quickly. On March 31, at about 2:00 PM, the manager called to report that the Taurus had just arrived at the meeting location, and that the other vehicle was not there yet. Sergeant Walters told the witness to call again when the other vehicle arrived, and directed Detectives Angela Reed and Darrick Engelman to the Plumwood Apartments. Sergeant Walters also headed toward the apartments. Before he got there, the witness called his administrative assistant to report that the other vehicle, a silver Dodge pickup truck with an Indiana handicap plate, had arrived and the two men had exchanged their items and were leaving. The witness provided the license plate number for the Dodge truck. She had previously provided the number for the Taurus, although a police search had not identified any Taurus matching that number.

As Officer Reed drove east on Lake Avenue toward Lakehurst Drive and the Plumwood Apartments, she saw a silver Dodge pickup truck with handicap plates driving in the opposite direction toward the intersection of Lake Avenue and Coliseum Boulevard. Detective Reed turned around and got behind the truck. Detective Engelman also saw the truck, and saw the

black Taurus directly behind it. As the two vehicles turned south onto Coliseum, Detective Engelman confirmed that the driver of the Taurus was a white male, and that the driver of the truck was a black male, which matched the general description of the two men provided by the witness. Police later learned that the driver of the truck was Joseph Jermaine Woods, and that Michael Glazier was driving the Taurus.

Detectives Reed and Engelman followed the two vehicles on Coliseum. Detective Engelman confirmed that the vehicle descriptions and license plate numbers matched the information provided by the witness, except that she had provided one incorrect digit for the Taurus. Upon confirming this, Detective Engelman determined that police would stop both vehicles. At highway 930, the Taurus and the truck split up, with the Taurus heading east and the truck going west. Detective Reed followed the Taurus, and Detective Engelman followed the Defendant.

Because he was driving an undercover vehicle, Detective Engelman requested that uniformed officers conduct a traffic stop. As he was broadcasting the truck's description and location, Detective Engelman heard an urgent assistance radio call for help for Detective Reed, who was to have been conducting a traffic stop of the Taurus. When he heard the urgent assistance call, Detective Engleman concluded that the man in the Taurus must have been fleeing, fighting, armed, or some combination of those circumstances, and therefore recommended that the stop of the truck be considered a high risk or felony traffic stop.[1]

Uniformed patrol officer Kurt Franceus responded to Detective Engelman's call for

---

[1] The Court heard testimony from Detective Reed that after she pulled Glazier over, he exited the vehicle and began running. As she chased Glazier, Officer Reed relayed the situation to dispatch and they put out an urgent assistance call on all police channels. After a short chase, Detective Reed apprehended Glazier and brought him back to her car.

5

uniformed assistance in making a traffic stop of the silver Dodge truck. He knew that he was acting pursuant to a drug investigation and per a detective's request, but did not know the details of the underlying investigation. Officer Franceus located the truck, followed it, and per Detective Engelman's instructions conducted a stop using extra caution for officer safety. Officer Franceus recovered a handgun from the Defendant's waistband area during a patdown frisk, and observed marijuana in plain view inside the truck. Police also found cash, two pounds of marijuana, and packaging consistent with large quantities of marijuana.

## CONCLUSIONS OF LAW

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Police officers are justified in conducting a brief investigative stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). It is a "commonsense, nontechnical" concept that deals with "the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotations marks omitted). In assessing the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Tilmon*, 19 F.3d

1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. at 21–22).

The Defendant recognizes that police officers are justified in conducting a brief investigative stop so long as it is supported by articulable suspicion, but maintains that Detective Engleman did not have reasonable suspicion to believe that he was engaged in criminal activity on the afternoon of March 31, 2009. In so arguing, he focuses on the fact that no member of law enforcement observed the Defendant at the apartment complex, or saw him commit any crime or infraction. Therefore, he argues, the police "basically did nothing but rely upon the word of a single, untrained, uncorroborated civilian witness." (Brief 7, DE 57.) Because much of the Defendant's challenge to the level of suspicion that was reasonable in this case rests on the conclusion that the police did not establish the reliability of the witness who reported the Defendant's actions to the police, the Court will address the matter of her reliability first.

### A.  Reliability of Apartment Manager Witness

An anonymous tip, if not corroborated by police observation, is generally insufficient to create reasonable suspicion. *See Florida v. J.L.*, 529 U.S. 266, 271–72 (2000). This is because in the usual anonymous-tip case, officers cannot assess the credibility of the source and have no way to hold the source responsible if the information turns out to be fabricated. *Id.*; *United States v. Robinson*, 537 F.3d 798, 802 (7th Cir. 2008) (stating that inability to assess credibility and hold a tipster responsible for false information "makes the tips less reliable and generally not sufficient to create reasonable suspicion"). In contrast, "reports made by identified witnesses should be given more weight than anonymous callers." *United States v. Booker*, 579 F.3d 835, 839 (7th Cir. 2009). Reports from tipsters claiming to have "inside information" are

7

distinguishable from "assertions of eyewitnesses to crime," which "generally do not need corroboration, or a history of other accurate reports, to be believed." *United States v. Woods*, 551 F.3d 647, 649–50 (7th Cir. 2008); *see also Illinois v. Gates*, 462 U.S. 213, 233–34 (1983) ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary.").

Based on these principals, the Court finds the following analysis, submitted by the Government in its Response Brief, to be an accurate assessment of the caller's reliability:

> The witness supplying the information in Woods's case was not an informant who had some inside knowledge about what Woods and Glazier were doing; rather, she was a concerned apartment manager simply reporting her observations about suspicious activity to police. She was reliable because her identity was known, and through an in-person interview of her at her place of employment, it is clear that she could have been tracked down and prosecuted for a false report. There was no evidence of a motive on her part to send police on a wild goose chase or otherwise to focus police attention on Woods and Glazier for some nefarious or improper reason. There was no reason at all for the police to question the truthfulness of this witness; there was no inconsistency in her information, she was very credible in Sergeant Walters's opinion in a face-to-face interview, and she provided a great deal of detail which, based upon the expertise of Sergeant Walters, fell right in line with his expectations about the behavior of drug dealers. Given the witness's responsibility for the safety and welfare of her apartment residents, there is little question that the witness was motivated by a genuine desire for the police to investigate these trespassers and their suspicious activity at the apartment complex.

(Government's Resp. Brief 12–13, DE 60.)

The police had no reason to disbelieve any of the information provided by the apartment complex manager, an eyewitness to the events about which she was reporting. The Court finds that the police were justified in crediting her statements. Next, the Court will address whether the information she provided, in conjunction with what police observed, was sufficient to justify an

8

investigatory stop of the Defendant's vehicle.

**B.      Investigatory Stop**

In assessing whether an investigatory stop was supported by reasonable suspicion, a court considers the "totality of the circumstances" as they were presented to the officer at the time of the encounter. *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995). "The totality of the circumstances encompasses both the experience of the law enforcement agent and the behavior and characteristics of the suspect." *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (quotation marks and brackets omitted).

The Court finds the following facts to be specific and articulable facts giving rise to a particularized and reasonable suspicion that the occupants of the two vehicles meeting at the Plumwood Apartments on March 31, 2009, were engaged in illegal drug trafficking. Twice a month over the course of several months, two men backed their vehicles up to a wooded area at the end of a cul-de-sac in an apartment complex. The two men would meet briefly, just long enough to exchange a loaded garbage bag for a duffel bag. They were not tenants of the apartment complex, and the vehicles did not belong to anyone who lived at the complex. One of the cars that was always present was from Ohio. Only one road provided access to the meeting spot, thus allowing the men to see any approaching threats and view possible police presence.

The behavior of these individuals, viewed from the perspective of experienced narcotics detectives, reasonably suggested that the occupants of the vehicles were at the apartment complex for the purpose of conducting a drug deal. Sergeant Walters considered the brevity of the meeting for the singular purpose of exchanging concealed items to be a significant hallmark

9

of a drug transaction. The regularity of the meetings at the chosen isolated location, the constant variation of the Indiana vehicle, and the presence of someone from Ohio were also factors that contributed to the totality of circumstances leading Sergeant Walters to believe that the men were trafficking drugs during their brief meetings at the Plumwood Apartments. The suspicions of the vice and narcotics detectives were based not only on their special knowledge and expertise, but also on "commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Although meeting someone in a parking lot could be interpreted as (and could actually be) innocent behavior, the pattern of conduct viewed in its totality firmly established reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct"); *United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007) (holding that "even when innocent explanations exist for individual factors taken separately, reasonable suspicion may arise when the factors are taken together"). "'[A] pattern of behavior interpreted by the untrained observer as innocent may justify a valid investigatory stop when viewed collectively by experienced drug enforcement agents'" *Askew*, 403 F.3d at 508 (quoting *United States v. Lechuga*, 925 F.2d 1035, 1039 (7th Cir. 1991)).

Indeed, once the statements of the apartment complex manager are credited as reliable information about what transpired during the previous meetings, and about what occurred on March 31, the Defendant has little to show that the police did not act reasonably in conducting an investigatory stop. Not only did specific facts, taken together with the rational inferences from those facts, create reasonable suspicion that the two men were meeting to exchange illegal drugs, but specific and articulable facts also gave rise to a reasonable suspicion that the two vehicles

that the police followed and then stopped on March 31, 2009, were the same vehicles that the manager at the Plumwood Apartments had just witnessed make a suspicious exchange. Sergeant Walters told the manager to call the police if she saw the vehicles at the apartment again. On March 31, she called Sergeant Walters to report that the Taurus was at the meeting spot. She called a few minutes later to say that the second vehicle with the Indiana handicap license plate, which she described as a silver Dodge pickup truck, was there and that the two men had already made their exchange and were leaving the apartment complex. She also provided the license plate number of the truck.

If the manager was accurate in her reporting of events, the police could expect to see a black male in a Dodge silver pickup truck with an Indiana handicap license plate and a white male in a black Ford Taurus driving out of the complex on Lakehurst Drive, or on the adjoining road, Lake Avenue. They saw both of these vehicles driving west on Lake Avenue, away from Lakehurst Drive and the apartment complex. The drivers of the vehicles were the correct race and gender, and the license plate numbers matched the numbers provided by the witness, with the exception of one incorrect digit for the Taurus. On these facts, Officer Engelman was justified in believing that these vehicles were the same ones that the manager had just witnessed at the Plumwood Apartments and requesting that the truck be stopped to further investigate his suspicions.

Although Officer Franceus was not personally aware of the details of the investigation, the officer who makes a stop need not have such personal knowledge, but may rely upon the conclusion of another officer who is aware of the facts. *See United States v. Hensley*, 469 U.S. 221, 231–33 (1985); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000). The facts

known by one officer are imputed to the seizing officer under the collective knowledge doctrine. Because Detective Engelman was in communication with Officer Franceus, Detective Engleman's knowledge can be imputed to Officer Franceus.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress [DE 39] is DENIED. A trial in this matter is scheduled to begin on Tuesday, February 16, 2010, at 8:30 AM. A Telephonic Final Pretrial Conference is set for Tuesday, February 9, 2010, at 11:30 AM. The Court will initiate the call.

SO ORDERED on January 5, 2010.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT